Edward B. and Florence W. GLICK
*v.*
DEPARTMENT OF REVENUE
(TC 3649)

Henry J. Kaplan, Portland, represented plaintiffs (tax-payers).

Jerry Bronner, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant (department) rendered June 6, 1995.

**CARL N. BYERS, Judge.**

Taxpayers appeal from an assessment of additional personal income taxes for 1991. The Department of Revenue (department) assessed the additional tax on pension distributions which taxpayers claim had previously been taxed by the state of Pennsylvania at the time of contribution to the plan. Taxpayers also assert that taxation of such funds by Oregon violates statutory and constitutional law. The parties have stipulated the facts and this matter is before the court on cross motions for summary judgment.

Taxpayers were employed as teachers in Pennsylvania. During their employment, they contributed to the purchase of tax-sheltered annuities under IRC § 403(b)(1)(A)(ii). The annuities were purchased by three types of contributions.

(1)   Contributions were made by taxpayers by salary deduction on an after-tax basis. These contributions were subject to both federal and state of Pennsylvania income taxes at the time of contribution.

(2)   Contributions were made by taxpayers by salary reduction. Taxpayers agreed with the employer to accept a reduced salary, and the employer contributed the difference to the pension plan. Contributions by salary reduction were not subject to federal income tax, but were taxed by Pennsylvania.

(3)   Contributions were made by taxpayer's employer. These contributions were not subject to either federal or state of Pennsylvania income taxes.

Taxpayers retired and moved to Oregon on August 13, 1991.[1] In 1991, taxpayers received a total of $71,935 from the tax-sheltered annuities. For federal income tax purposes, taxpayers excluded $13,123 as a return of cost basis. This amount was attributable to contributions made by salary deduction and subjected to both federal and state tax at the time of contribution. By virtue of its exclusion from federal taxable income, the $13,123 was automatically excluded from taxpayers' Oregon taxable income.

The remaining $58,812 was included in taxpayers' federal taxable income and was duly reported by them. However, taxpayers believed the $58,812 had been taxed previously by Pennsylvania at the time the contributions were made. Consequently, they subtracted that amount on their 1991 Oregon income tax return.

The department contends that the $58,812 is made up of employer contributions and earnings on contributions as well as the taxpayers' contributions by salary reduction. It

---

[1] Taxpayers mistakenly filed a full-year resident return. However, that error is not important to the legal issue presented here.

is not necessary for the court to address this contention unless taxpayers prevail on the primary legal issue.

The primary legal issue is whether taxpayers are entitled to subtract all or any portion of the $58,812 under ORS 316.159.

ORS 316.159[2] provides in part:

"(1)(a)   In addition to other modifications to federal taxable income contained in this chapter, there shall be subtracted from federal taxable income of a resident individual the distributions received by the individual *from a plan or trust described under subsection (2)* of this section * * *." (Emphasis added.)

The "plan or trust" described in ORS 316.159(2) is limited to plans coming within either IRC § 408 or IRC § 401(c)(3).

■      Taxpayers' pension distributions are from IRC § 403(b) plans, a class of plan not described in ORS 316.159. It appears that the legislature did not include this class of plan because all states except Pennsylvania treat contributions to IRC § 403(b) plans as nontaxable.

Taxpayers contend that ORS 316.159 should be construed by the court to include distributions from IRC § 403(b) plans. They argue that legislative history indicates the legislature intended to exclude all pension distributions previously taxed by another state. Since all states except Pennsylvania exclude distributions under IRC § 403(b), taxpayers believe the legislature simply overlooked Pennsylvania's circumstance.

■      The legislative history shows that the legislature at least had the information, if not the awareness, that Pennsylvania did not follow federal law. However, whether the legislature failed to accommodate distributions under IRC § 403(b) plans inadvertently or intentionally is irrelevant. The language of ORS 316.159 is not ambiguous and does not require construction. Taxpayers are asking the court to add something to the statute which they believe the legislature

---

[2] All references to the Oregon Revised Statutes are to the 1991 Replacement Part.

inadvertently omitted. The legislature has expressly prohibited the courts from either adding to or subtracting from legislative language. ORS 174.010.[3]

In the alternative, taxpayers contend that ORS 316.159 violates Article I, section 20, and Article I, section 32, of the Oregon Constitution, the Equal Protection Clause, and the Interstate Privileges and Immunities Clause of the United States Constitution. In support of their contention, taxpayers argue that ORS 316.159 contains an invidious classification which discriminates against former residents of Pennsylvania. The court finds taxpayers' arguments in support of this contention are without merit.

■     The statute allows a subtraction for distributions received from specified types of plans or trusts. The legislative purpose is to decrease the tax burden on particular taxpayers who moved to Oregon and received pension benefits while living here. This statute does not discriminate between states or types of income. All taxpayers who come within the terms of this statute qualify for its benefits regardless of the state of origin. If there is any discrimination, it is not a result of the Oregon statute. Taxpayers' disadvantage, in this instance, results from the action of the state of Pennsylvania, not Oregon.

Oregon is not required to accommodate all forms and schemes of state taxation. ORS 316.159 is based upon classifications under the Internal Revenue Code, not the Pennsylvania statute. Pennsylvania may exercise its power of taxation contrary to the federal scheme, but it cannot mandate that Oregon should conform to its statutes. Now, therefore,

IT IS ORDERED that department's motion for summary judgment is granted.

IT IS FURTHER ORDERED that taxpayers' motion for summary judgment is denied. Costs to neither party.

---

[3] ORS 174.010 provides:

"In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all."

HOOD RIVER COUNTY,
Director of Records and Assessment
*v.*
DEPARTMENT OF REVENUE
(TC 3644)

James C. Rinehart, Hood River County Counsel, Hood River, represented plaintiff.

James C. Wallace, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered June 19, 1995.

**CARL N. BYERS, Judge.**

This matter is before the court on cross motions for summary judgment. Hood River County (county) appeals from a Department of Revenue (department) opinion and order which held the assessment of a taxpayer's leasehold interest in federal government property unconstitutional.

The parties stipulated the relevant facts and argued the legal issues.

A taxpayer entered into an agricultural lease with Bonneville Power Administration (BPA), an agency of the United States government. The lease was for five years and limited use of the land to crop use only. In lieu of rent, the taxpayer agreed to keep the leased land and an adjacent area free from weeds.

County disqualified the leased area from exempt status and assessed the lessee for property taxes under ORS 307.060.[1] BPA appealed to the department, claiming the land was exempt. Although the department found the lease was taxable under ORS 307.060, it also found ORS 307.110 imposed a lesser burden on lessees of state-owned property, thereby making the assessment unconstitutional.

■       County asserts that: (1) BPA did not have standing to appeal to the department and, (2) BPA, as an agency of the United States government, does not qualify as a "person" aggrieved under ORS 305.275. Neither of these issues was raised at the administrative hearing. The court finds contrary to plaintiff's position on both issues. As the fee owner of the property, BPA has standing to appeal any assessment of taxes against the property. Also, BPA and the United States government are "persons" within the meaning of ORS 305.275.

On the merits, the issue is whether assessment of the lessee's interest is unconstitutional by virtue of Oregon's disparate treatment of lessees of state land and lessees of federal land.

---

[1] All references to the Oregon Revised Statutes are to the 1989 Replacement Part.

The relevant portion of ORS 307.060 provides:

"Real and personal property of the United States or any department or agency thereof held by any person under a lease or other interest or estate less than a fee simple, other than under a contract of sale, shall be assessed and taxed as for the full true cash value thereof subject only to deduction for restricted use. The lien for the tax shall attach to and be enforced against only the leasehold, interest or estate in such real or personal property. This section shall not apply to real property held or occupied primarily for agricultural purposes under the authority of a federal wildlife conservation agency or held or occupied primarily for purposes of grazing livestock."

Plaintiff contends that the issue has already been resolved by the Oregon Supreme Court in *Sproul et al v. Gilbert et al*, 226 Or 392, 359 P2d 543 (1961). In that case, the assessor assessed a taxpayer's right to graze cattle on federal land. The taxpayer claimed the assessment was unconstitutional because "* * * ORS 307.060 taxes interests in land less than a leasehold, whereas ORS 307.110 taxes only leaseholds * * *." *Id.* at 422. In upholding the assessment, the court acknowledged the decision in *Phillips Chemical Co. v. Dumas School Dist.*, 361 US 376, 80 S Ct 474, 4 L Ed 2d 384 (1960). In *Phillips*, the United States Supreme Court held that Texas laws violated the United States Constitution because they subjected property leased from the state to a lesser tax burden than property leased from the federal government. In discussing the *Phillips* decision, the Oregon Supreme Court stated:

> "We find no similar disparities under the Oregon statutes between the burden on lessees from the state or its political subdivisions and lessees from the federal government." *Sproul*, 226 Or at 424-25.

If the statutes underlying the *Sproul* decision had not changed, plaintiff would prevail. However, during the intervening 30 years, the legislature amended ORS 307.110. Specifically, ORS 307.110(3) now provides in relevant part:

> "Nothing contained in this section shall be construed as subjecting to assessment and taxation any publicly owned property described in subsection (1) of this section which is:
>
> "* * * * *
>
> "(b) Leased to or rented by persons, other than sublessees or subrenters, for agricultural or grazing purposes and for other than a cash rental or a percentage of the crop."

█ The court finds the Oregon statutes impose a tax on lessees of federal land but exempt lessees of state land.

This kind of disparate treatment of lessees is the very situation condemned in *Phillips*. The holding of *Phillips* was reaffirmed in *Davis v. Michigan Dept. of Treasury*, 489 US 803, 109 S Ct 1500, 103 L Ed 2d 891 (1989), where the Court paraphrased the holding in *Phillips* by stating:

> "Under our precedents, '[t]he imposition of a heavier tax burden on [those who deal with one sovereign] than is

imposed on [those who deal with the other] must be justified by significant differences between the two classes.'" *Davis*, 489 US at 815-16.

■ In *Davis*, the Court explained that the test is "whether the inconsistent tax treatment is directly related to and justified by 'significant differences between the two classes.'" *Davis*, 489 US at 816, citing *Phillips*, 361 US at 383-85. In this case, county contends that the department is obligated to establish the absence of any significant differences. However, the department asserts that by admitting the statute is unconstitutional it shifts the burden of proof to anyone opposing that position. The court agrees with the department.

County maintains there are significant differences justifying the two classifications. However, most of the differences noted by county were the same conditions rejected in *Phillips*.

■ The court finds that assessment of ad valorem taxes against the federal lessee violates the constitutional principle of intergovernmental immunity. This was the same determination made by the department's Opinion and Order No. 93-3271, therefore that order must be sustained. Now, therefore,

IT IS ORDERED that Hood River County's Motion for Summary Judgment is denied; and

IT IS FURTHER ORDERED that the Department of Revenue's Motion for Summary Judgment is granted. Costs to neither party.

Gary L. JENSEN
and Janelee H. Jensen
*v.*
DEPARTMENT OF REVENUE
(TC 3716)

Marc K. Sellers, Schwabe, Williamson & Wyatt, represented plaintiff (taxpayer(s)).

Jerry Bronner, Assistant Attorney General, Department of Justice, represented defendant (department).

Decision for defendant rendered June 21, 1995.

**CARL N. BYERS, Judge.**

Taxpayers appeal from adjustments to their 1990 and 1991 Oregon personal income taxes. They claim certain income was exempt from Oregon tax by virtue of Public Law 101-322, the Amtrak Reauthorization and Improvement Act of 1990. After an administrative hearing, the Department of Revenue (department) determined that taxpayers' income

was taxable because they did not qualify under the federal law. Taxpayers then appealed to this court.

## FACTS

During the years in question Gary Jensen (taxpayer) was employed by Consolidated Freightways Corporation (Consolidated), an interstate trucking firm. Consolidated is a "less than truckload" carrier and uses many freight terminals and consolidation centers. A consolidation center may be viewed as a mother terminal which coordinates shipments for maximum efficiency. Consolidated is organized into operating divisions with each division having a number of operating groups. Taxpayer is the manager of the Portland Operating Group. The Portland Operating Group has a consolidation center in Portland and satellite terminals in various parts of Oregon, Washington, and Idaho.

As Group Operations Manager, taxpayer is responsible for the entire group, including freight flow, personnel, vehicles and equipment. Taxpayer's group has 750 to 800 employees, a large number and variety of vehicles, and a high volume of freight. Taxpayer obtained his position after 22 years of experience with Consolidated, beginning at the lowest level.

The court received evidence with regard to taxpayer's specific duties and his job performance. Taxpayers presented this evidence to establish that taxpayer directly affects safety. The evidence demonstrated that Consolidated places a high value on safety in its operations. With accident prevention as a major element in its program, the company conducts frequent safety meetings, inspections and training. Safety is stressed in all aspects of the company's operation and taxpayer's performance as Group Operations Manager is evaluated with regard to specific safety standards and goals.

Taxpayer's management duties include safety considerations and policies. For example, taxpayer has authorized and ordered drug testing for employees, and has personally road tested a truck driver's abilities. In completing self-audit questionnaires, used by Consolidated as a

management tool to improve its operations, he has physically checked vehicles for proper maintenance. He also investigates accidents involving Consolidated vehicles. Taxpayer has extensive authority to implement safety policies and other decisions, including progressive discipline, ordering repairs or taking vehicles out of service.

Taxpayer is an upper level manager, reporting to a division manager. All terminal managers in the Portland Operating Group and all the managers within the Portland consolidation center report to taxpayer.

Notwithstanding the scope of his responsibilities, taxpayer's primary duty is the operation of the Portland consolidation center. The consolidation center operates 24 hours per day, every day of the week. Taxpayer is on call at all times and typically works a 10-14 hour day. He visits the other terminals in the Portland Operating Group on an as-needed basis. He may visit the other terminals to investigate accidents, evaluate the facilities, check on problems, or hold safety or other training meetings. These visits are not frequent and taxpayer spends approximately 90 percent of his time at the Portland center.

## LAW

Taxpayer resides in Vancouver, Washington. Although he spends the majority of his working time in Portland, he contends that the income earned in Oregon is not taxable by Oregon. The basis for this claim is a special provision in federal legislation which reads:

"No part of the compensation paid by a motor carrier * * * to an employee who performs regularly assigned duties in 2 or more States as such an employee with respect to a motor vehicle shall be subject to the income tax laws of any State or subdivision of that State, other than the State or subdivision thereof of the employee's residence." 49 USC § 11504(b)(1).

Subparagraph (2) of the statute states: "In this subsection 'employee' has the meaning given such term in section 31132 of this title." This adoption of a definition by reference requires the court to also construe section 31132, the relevant portion of which states:

"(2) 'employee' means an operator of a commercial motor vehicle (including an independent contractor when operating a commercial motor vehicle), a mechanic, a freight handler, or an individual not an employer, who—

"(A) directly affects commercial motor vehicle safety in the course of employment; * * *." 49 USC § 31132(2).

## ISSUE

The issue is whether taxpayer qualifies as an "employee who performs regularly assigned duties in 2 or more States as such an employee with respect to a motor vehicle" under 49 USC § 11504(b)(1).

## ANALYSIS

This appears to be a case of first impression. There are no cases construing the statutes and no legislative history to provide guidance with regard to legislative intent. Hence, the court must rely upon the wording of the statutes and general principles of statutory construction.

In construing these statutes, the court first considers their relative positions and purposes within the larger framework. The subject of Title 49 of United States Code is transportation. Within that title, Subtitle VI pertains to motor carriers. Part B of Subtitle VI concerns commercial motor carriers; and, within that part, chapter 311 contains the laws concerning safety regulation. Section 31132 of 49 USC is found within chapter 311.

Subtitle IV contains general interstate commerce provisions addressing such topics as jurisdiction, rates and tariffs, licensing and operations. Chapter 115 of that subtitle addresses federal-state relations. Consequently, section 11504(b)(1), restricting the state's jurisdiction to tax, is not in the same chapter or even in the same subtitle as the statute defining the term "employee."

The policies underlying two subtitles and chapters are not necessarily related or coordinated. The purpose of Subtitle IV is to clarify the lines of jurisdiction and authority between the states and the federal government. They are intended to avoid disputes between those governmental bodies. Such is the context of section 11504(b)(1) which

relieves certain traveling motor carrier employees from burdensome tax obligations. On the other hand, the purpose of the laws in chapter 311 is to promote safety. In fact, section 31131 sets out the purposes of that subchapter:

"(1)  to promote the safe operation of commercial motor vehicles;

"(2)  *to minimize dangers to the health of operators of commercial motor vehicles and other employees whose employment directly affects motor carrier safety*; and

"(3)  to ensure increased compliance with traffic laws and with the commercial motor vehicle safety and health regulations and standards prescribed and orders issued under this chapter." (Emphasis added.)

In this case, the court must construe the term "employee," which is used in the context of safety statutes, to determine the application of a statute in the context of federal-state relations.

The positions of the parties reflect in some ways the disparate purposes of the statutes. Taxpayer seeks a broad interpretation, arguing that any employee with an impact on safety who works in two or more states qualifies. In opposition, the department argues that by specifically describing the type of employees, Congress intended to limit the tax benefits to employees whom defendant characterizes as "hands on."

Taxpayer is not a driver, mechanic or freight handler. Consequently, he can qualify for the tax benefit or exemption only if he is "not an employer" and he "directly affects commercial motor vehicle safety in the course of his employment." The statute defines an employer as:

"[A] person engaged in a business affecting interstate commerce that owns or leases a commercial motor vehicle in connection with that business, or assigns an employee to operate it; * * *." 49 USC § 31132(3)(A).

Taxpayer is "engaged in a business" within the common meaning of that term. That is, taxpayer employs his time and effort in a business affecting interstate commerce. Moreover, taxpayer is one who "assigns" an employee to operate a commercial motor vehicle. Consequently, for the

limited purpose of this statute, taxpayer may be an "employer" rather than an employee.

■ The words used in the definitions of employee and employer suggests that Congress intended to distinguish between those who do and those who delegate. The described employees: *i.e.*, operators, mechanics, and freight handlers, all identify positions which require hands-on work. Logically, the open-ended category of employees who "directly affect" vehicle safety also suggests positions which require the use of hands in performing their duties. Employees in this category would be performing such tasks as repairing tires, fueling vehicles, servicing vehicles, inspecting vehicles for safety, etc.

■ On the other hand, there are those who delegate, such as managers, supervisors, and consultants. All such positions may have an impact on safety, but they do not directly affect the operation of a commercial motor vehicle in the sense intended by the statute. The statute limits "directly affects" to employees whose daily routine and duty has them moving, touching, or affecting a commercial motor vehicle or its contents. It is these employees who are at risk of injury if the commercial motor vehicle is improperly operated, loaded, repaired or maintained. If brakes fail, a tire explodes, or a driver loses control because the load shifts, it is the hands-on employees who are at risk. Supervisors, managers and other employees are less likely to be injured or have their health impaired by failure to comply with the safety regulations.

From another perspective, it is unlikely that Congress intended to impose a duty on an employee who cannot comply with the law. A supervisor may instruct a driver on safe driving, but only the driver can actually control the operation of the vehicle. If a driver operates a vehicle unsafely, it is the driver who is at risk and it is the driver who directly affects that safety.

■ This perspective is consistent with the language used in section 11504(b)(1), which extends the tax benefit to an employee who performs regularly-assigned duties "with respect to *a* motor vehicle." (Emphasis added.) This wording suggests a direct one-on-one relationship between the

employee and a motor vehicle. That is, an employee does something with respect to a vehicle which directly affects safety relative to that vehicle.

It is noteworthy that this is the one consistent theme between separate chapters in separate subtitles with different purposes. Both section 11504(b)(1) and section 31132 are consistent in requiring an employee to have a direct, hands-on relationship with a motor vehicle. While a supervisor may be responsible for vehicles, and the supervisor's work may have a significant impact upon safety, that impact is not direct, but is implemented through others.

Authority is not the issue. A Group Operations Manager may have authority to order drug tests, remove vehicles and in other ways significantly affect the safe operations of the company. However, this is undoubtedly true of the chief executive officer and many vice presidents and managers. If all managers and supervisors whose decisions affected safety were deemed to be an employee who "directly affects" safety, that phrase would be almost meaningless.

The Group Operations Manager's regularly assigned duties may require performance of duties in two or more states, but it is not with respect to *a* vehicle. The manager's concerns are large in scope, and his duties require him to communicate with all levels of personnel. He is not in the same category as employees who regularly repair brakes, secure freight and drive the vehicles. It is the health and safety of these types of employees that Congress intended to protect in section 31132. Consequently, it is the same limited group to whom Congress extended the benefits of section 11504(b)(1). Accordingly, the court finds that taxpayer is not an employee within the meaning of section 31132.

In view of the above, department's Opinion and Order No. 93-4224 is sustained. Costs to neither party.

Tommie A. GOSSETT
and Lynn E. Gossett
*v.*
DEPARTMENT OF REVENUE
(TC 3665)

Joseph Wetzel, Wetzel DeFrang & Sandor, Portland, represented plaintiffs.

Jerry Bronner, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered April 6, 1995.

**CARL N. BYERS, Judge.**

Plaintiffs appeal an assessment of additional income taxes for 1990. Defendant found that a portion of the property sold by plaintiffs was not their principal residence. Accordingly, defendant required recognition of the gain on that portion and assessed additional taxes.

FACTS

In 1968, Tommie was employed as a policeman for the city of Portland. Seeking the serenity of country living, he located and purchased 38.69 acres for $40,000. The property was improved with a house and other outbuildings. Approximately 16 acres of the property is pasture, and 17.69 acres is forestland. At the time of purchase, the pastureland qualified for and was specially assessed for farm use. At the seller's suggestion, Tommie applied for and obtained special farm use assessment.

The sale included a number of cattle, later discovered to be suffering from hoof rot. When Tommie determined that the fungus was in the soil, he sold the cattle. The 16 acres of pastureland produced a grass crop of 600-700 bales per year. Plaintiffs paid $0.75 cents to $1.00 per bale for cutting and baling, and sold the baled grass hay for approximately $1.50 per bale.

Within three years of purchasing the property, Tommie applied for the timbered area to be designated as forestland. During the time he owned the property, Tommie did not harvest any trees except as was necessary to maintain a power line easement.

Plaintiffs sold the property in 1990 for $300,000, realizing a gain of $215,905. Plaintiffs treated the gain as deferred because they considered the entire 38.69 acres as their principal residence. Defendant disallowed the deferral with regard to the gain attributable to the forestland and

pastureland. Defendant agreed that the gain attributable to the house and five acres surrounding the house was from plaintiffs' principal residence.

## ISSUE

The issue before the court is whether all of the 38.69 acres constituted plaintiffs' principal residence.

## ANALYSIS

■■ IRC section 1034 provides for deferral of recognition of the gain realized on the sale of a principal residence if the taxpayer purchases a new principal residence of equal or greater cost within two years. The term "principal residence" is not defined by the code. The courts have construed the term to mean an individual's principal dwelling place, whether it be an apartment, mobile home, boat, houseboat or other accommodation. The term includes land used in connection with the dwelling.

■ Whether land around a dwelling is used for residential purposes or for other purposes depends upon "all the facts and circumstances in each case." Treas Reg § 1.1034-1(c)(3)(i). Even large estates in excess of 100 acres may qualify as a principal residence. However, the key is the relationship in use between the land and the dwelling. Land which is separated from the dwelling and sold as vacant land does not qualify as a sale of a principal residence. *See O'Barr v. Commissioner*, 44 TC 501 (1965).

■ The regulations and the cases recognize that a property may be partly used for a principal residence and partly used for other purposes.

> "Where part of a property is used by the taxpayer as his principal residence and part is used for other purposes, an allocation must be made to determine the application of this section [§ 1034]." Treas Reg § 1.1034-1(c)(3)(ii).

